# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Antrell R. Felder, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2017-001173

―――――――

## ON WRIT OF CERTIORARI

―――――――

Appeal From Sumter County
D. Craig Brown, Circuit Court Judge

―――――――

Opinion No. 27913
Submitted June 17, 2019 – Filed August 7, 2019

―――――――

## REVERSED AND REMANDED

―――――――

Appellate Defender David Alexander, of Columbia, for Petitioner.

Attorney General Alan Wilson and Deputy Attorney General Donald J. Zelenka, both of Columbia, for Respondent.

―――――――

**CHIEF JUSTICE BEATTY:** A jury convicted Antrell Felder of murder and possession of a firearm during the commission of a violent crime. Following a hearing on Felder's application for post-conviction relief ("PCR"), the PCR court issued an order denying and dismissing Felder's application. We find the PCR court

erred in determining trial counsel was not ineffective.  Accordingly, we reverse the PCR court's decision and remand this matter to the court of general sessions for a new trial.

## I.  FACTS

Shortly after midnight on July 18, 2008, Kayla McFadden and her cousin, Antrell McFadden, were walking to a gas station in Sumter.  On the way, the McFaddens saw a car drive down the street towards them.  They subsequently observed a man get out of the car, shoot the victim, and drive away.

Kayla testified the shooter was driving a white car with tinted windows, but she did not know the type of car.  Antrell also testified the car was white with tinted windows.  Kayla described the shooter as wearing a hat, white shirt, and dark pants.  Similarly, Antrell described the shooter as wearing a red and black hat, white shirt, and blue jeans.  Both McFaddens testified the victim was not wearing a hat.  Detective William Lyons of the Sumter Police Department responded to the 911 call about the shooting.  When he arrived at the scene, he observed a red baseball hat in the roadway.

After the McFaddens provided statements at the police station, Lyons and another detective, Jason Potteiger, drove them home.  While on the way, the officers noticed a white car pass them at Willow Morand Apartments.  The car "caught [their] attention," and the "[McFaddens] made comments like, it looks like the vehicle. That can be the vehicle, I'm not sure."  Because the officers were traveling with the McFaddens, they asked another officer to investigate.  The officer went to Willow Morand Apartments and determined Felder's sister-in-law lived there.  Felder's girlfriend was driving the vehicle (a white Buick), and it was registered to Felder's mother.

When Lyons and Potteiger returned to the police station, they learned of a burglary that had occurred on Harry Street.  Lyons testified the 911 call about the burglary came in at 12:37 AM, and the 911 call about the shooting came in around 12:38 or 12:39 AM.  The officers began investigating whether there was a connection between the two incidents.  Lyons testified he never drove the distance between the two locations, but he believed it would take less than a minute in a vehicle to get from one location to the other.

Lyons returned to the McFaddens' home around 6:30 PM (approximately eighteen hours after the shooting) to show them a lineup.  Antrell indicated that he recognized two people, one of whom was Felder who was labeled as "No. 2."

However, neither Kayla nor Antrell was able to identify anyone in the lineup as the shooter, and both testified they could not see who fired the gun.

Fingerprint experts examined the red hat recovered from the crime scene and found two fingerprint images on a gold label affixed to the hat. One of the fingerprints was identified as belonging to Felder. The second fingerprint could not be positively identified. In addition, law enforcement found Felder's DNA inside the hat, as well as the DNA of an unknown person.

Police confiscated the Buick on the same day as the shooting. During trial, Lyons viewed photographs of the vehicle and stated it appeared tint had been removed from the windows.[1] Lyons admitted, however, that there was no official report or handwritten documents stating window tint had been removed. Lyons also stated the Buick in the photographs had white handles, though a third witness told police the shooter's car had silver handles. Furthermore, a crime scene investigator testified he found blood in the Buick on a receipt and the radio controls, but the blood belonged to Felder. Law enforcement did not find any blood or DNA evidence belonging to the victim in the car.

At trial, the State moved to admit a summary of Felder's oral statement to police. Trial counsel expressly stated he did not object to the admission of the evidence. Potteiger testified he spoke with Felder at the police station and prepared a typed summary of Felder's oral statement. Potteiger then read the summary out loud, including the following portion:

> Antrell Felder began by stating he was 26 years old, that his date of birth was [redacted] 1982, and that he lived at [redacted]. **He related that he was currently on bond for a lynching charge** . . . .

Potteiger continued to read the remainder of the summary, which indicated Felder was hanging out at his sister-in-law's home on July 17. Felder stated someone he knew called him at 11:59 PM and told him four men were in the process of breaking into his home. Felder, accompanied by several family members, went to his house to investigate, but he left the home before police arrived. He told police that shoes, hats, and some clothing were taken from his home. Felder intimated he went back to his sister-in-law's apartment and then to visit a woman in Red Bay.

---

[1] Potteiger also testified the lines across the main window in the car appeared to be consistent with the removal of tint.

According to Felder, he arrived in Red Bay between 12:25 and 12:35 AM, and he did not leave the area until 3:00 AM.

The defense did not call any witnesses and rested immediately after the State rested. At the conclusion of the trial, the jury convicted Felder, and the trial court sentenced him to concurrent terms of forty-two years for the murder conviction and five years for the weapons possession conviction. On direct appeal, the Court of Appeals affirmed Felder's convictions and sentences. *State v. Felder*, Op. No. 2013-UP-437 (S.C. Ct. App. filed Nov. 27, 2013).

Felder subsequently filed a PCR application, alleging, *inter alia*, ineffective assistance of counsel. During the PCR hearing, Felder's attorney asked lead trial counsel, Shaun Kent, whether he would describe the State's evidence as strong. Kent stated: "Not really. I mean, it was a strong circumstantial case; but it wasn't the best case, I thought." Kent testified he discussed the planned stipulations with Felder, and that Felder "understood everything." During cross-examination, the following colloquy occurred:

> Q: But because he had mentioned in his oral statement to the police being on bond for lynching at the time as prior acts, did you make objection to the entrance -- including his oral statement without redaction -- of those particular pieces of fact based on prior acts and prejudicial?
>
> A: I don't remember but I don't think I did. No, Tim. And if I didn't, based on your question, that would be a mistake.

Kent indicated he did not believe the outcome of the trial would have been different if the reference to the lynching charge had been excluded.

Felder's other trial counsel, Ray Chandler, also testified at the PCR hearing. When asked whether the lynching reference changed the outcome of the trial, Chandler responded: "You could argue it in retrospect . . . . I would argue it hard in retrospect." Chandler went on to explain that the defense's theory was Felder could not have gotten from his home to murder the victim within three minutes. Chandler then added: "So that seemed to be our theory at reasonable doubt. Whether our client had a pending charge or not was not as important to me as was getting across to the jury that he couldn't have done it."

The PCR court ultimately denied Felder's request for relief and dismissed his application with prejudice, finding:

> Trial Counsel credibly testified that he discussed this stipulation before the trial and Applicant did not raise this issue; Applicant understood and agreed with the decision to stipulate. The statement was a voluntary statement given by Applicant to law enforcement, and it is unlikely that Applicant could have kept it out of evidence.

This Court granted Felder's petition for a writ of certiorari to consider whether the PCR court erred in determining Felder's trial counsel was not ineffective in allowing the admission of the un-redacted summary of Felder's statement to police.

## II.  STANDARD OF REVIEW

"In a PCR case, this Court will uphold the PCR court's factual findings if there is any evidence of probative value in the record to support them." *Thompson v. State*, 423 S.C. 235, 239, 814 S.E.2d 487, 489 (2018) (citing *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016)). "However, this Court gives no deference to the PCR court's conclusions of law, and we review those conclusions de novo." *Id.* (citing *Jamison v. State*, 410 S.C. 456, 465, 765 S.E.2d 123, 127 (2014)).

## III.  LAW/ANALYSIS

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, a PCR applicant must show: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To show deficient performance, an applicant must prove "counsel's representation [fell] below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, an applicant must show "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Smith v. State*, 386 S.C. 562, 565–66, 689 S.E.2d 629, 631 (2010) (quoting *Strickland*, 466 U.S. at 694).

### a. Deficient Performance

The PCR court found "it is unlikely that Applicant could have kept [the statement] out of evidence." We disagree. Although the summary of Felder's oral statement was likely admissible, the specific mention of his lynching charge was

wholly inadmissible under Rule 609, SCRE, which permits the admission of *convictions*—not charges.[2] The reference to Felder's lynching charge was also inadmissible under Rule 404(b), SCRE, as improper character evidence. *See* Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). Even assuming the lynching charge was admissible, there is a reasonable probability that the trial court would have excluded it. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

Trial counsel had at least two opportunities to prevent the inclusion of the lynching charge, and he failed to object even once. First, during pre-trial motions, trial counsel indicated he did not have any objections under *Jackson v. Denno*[3] to the validity or voluntariness of Felder's oral statement to law enforcement. Second, when the State moved during trial to admit the summary of Felder's oral statement, trial counsel expressly stated he did not object to the admission of the evidence. In addition, when Potteiger mentioned the lynching charge, trial counsel failed to object and ask for a curative instruction. Because trial counsel's error fell below an objective standard of reasonableness, we conclude trial counsel's performance was deficient.

### b. Prejudice

"In determining whether the applicant has proven prejudice, the PCR court should consider the specific impact counsel's error had on the outcome of the trial." *Smalls v. State*, 422 S.C. 174, 188, 810 S.E.2d 836, 843 (2018). The PCR court should also evaluate "the strength of the State's case in light of all the evidence presented to the jury." *Id.* Generally, "the stronger the evidence presented by the State, the less likely the PCR court will find the applicant met his burden of proving

---

[2] The notes to Rule 609 state: "[Subsection A] . . . allows impeachment with a *conviction* for any crime which carries a maximum sentence of death or imprisonment for more than one year." Rule 609 note, SCRE (emphasis added); *see Clark v. Cantrell*, 332 S.C. 433, 450, 504 S.E.2d 605, 614 (Ct. App. 1998) ("Rule 609(a), SCRE, does not permit mere charges to be used as impeachment evidence.").

[3] 378 U.S. 368, 380 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.").

prejudice." *Id.* However, "the existence of 'overwhelming evidence' does not automatically preclude a finding of prejudice." *Id.* at 189, 810 S.E.2d at 844.

### i. Specific Impact of Counsel's Error

Because trial counsel allowed the admission of the un-redacted summary, the jury learned Felder had a pending lynching charge at the time of the murder. The reference to the lynching charge was indisputably propensity evidence that served no purpose other than to prejudice Felder. In this case, the risks associated with propensity evidence were heightened due to the specific crime—lynching. The word "lynching" is extremely problematic in itself. It immediately evokes a visceral reaction and a grim mental image. The lynching reference could reasonably cause a juror to presume Felder was a violent person and deserving of a guilty verdict.

Because Felder did not take the stand, the summary of his oral statement (by way of Potteiger's testimony) was the sole means by which Felder gave his side of the story. Accordingly, it is reasonable to believe the jury focused—at least to some extent—on the summary because it provided Felder's version of events. Further, the State entered the summary into evidence as an exhibit, and the jury received a copy to consider during their deliberations. Thus, it is misleading to say the lynching charge was merely mentioned in passing.

Had trial counsel objected, it is almost certain the trial court would have excluded the reference to Felder's lynching charge under the South Carolina Rules of Evidence, particularly Rule 609.[4] Consequently, but for trial counsel's error, the jury would have never heard any mention of Felder's lynching charge.

### ii. Strength of the State's Case

The evidence in this case was primarily circumstantial. The State's strongest evidence was the red baseball hat recovered from the crime scene. However, the hat contained Felder's DNA as well as the DNA of an unknown individual. Moreover, two fingerprints were found on the hat—one belonging to Felder and another that could not be positively identified. Ultimately, the baseball hat proved only that

---

[4] There was a discussion of Felder's lynching charge at the end of the trial, in which the trial court stated: "I don't think the lynching is admissible under . . . 609. Prior convictions. And a pending charge would not be admissible. So the one charge that could be used against him would be the -- not the lynching, but the other."

Felder possessed the hat at some point in time, and it did not directly link Felder to the murder or crime scene.[5]

Both Kayla and Antrell testified they did not see the shooter, and neither could identify Felder as the shooter in a lineup. *See Smalls*, 422 S.C. at 192, 810 S.E.2d at 845 ("The fact [the witness] could only narrow it down to two people in the photographic lineup undermines—not supports—the notion of overwhelming evidence."). Here, when presented with a lineup, neither witness even so much as indicated that Felder *might* have been the shooter.

The evidence regarding the vehicle was also circumstantial. Neither Kayla nor Antrell was certain the car they saw on the way home was the shooter's car. Moreover, a third witness told law enforcement the car had silver handles, whereas the Buick had white handles. The McFaddens described the shooter's vehicle as having tinted windows. The Buick did not have tinted windows (though two officers testified the windows appeared to have had the tint removed). Furthermore, law enforcement was unable to find any of the victim's blood or DNA in the Buick.

There is no evidence in the record that conclusively links Felder to the murder. Accordingly, one could hardly say "overwhelming evidence" of Felder's guilt exists. *See Smalls*, 422 S.C. at 192, 810 S.E.2d at 845 ("[F]or the evidence to be 'overwhelming' such that it categorically precludes a finding of prejudice . . . [it] must include something conclusive, such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the *Strickland* standard . . . cannot possibly be met.").

After weighing trial counsel's error against the strength of the State's case, we conclude the error creates a reasonable probability that the outcome of Felder's trial would have been different had trial counsel acted to exclude the reference to the lynching charge.

## IV. CONCLUSION

Based on the foregoing, we find the PCR court erred in determining trial counsel was not ineffective. Accordingly, we reverse the PCR court's decision and remand this matter to the court of general sessions for a new trial.

---

[5] Felder also told police that hats were stolen from his home.

**REVERSED AND REMANDED.**


**KITTREDGE, HEARN, FEW and JAMES, JJ., concur.**